**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

KEVIN E. LINCK,                          *
                                         *
        Plaintiff,                       *
                                         *
        v.                               *        Civil Action No. AW-07-3078
                                         *
ARROW ELECTRONICS, INC., *et al.*,       *
                                         *
        Defendants.                      *
**********************************************************************

**<u>MEMORANDUM OPINION</u>**

Plaintiff Kevin Linck ("Linck") brings this action against Defendant Life Insurance Company of North America[1] ("LINA") challenging the cancellation of his long-term disability benefits. LINA filed a counterclaim against Linck seeking to recover an alleged overpayment of long-term disability benefits in the amount of $57,527.60. Currently pending before the Court are Linck's Motion for Summary Judgment, LINA's Motion for Judgment on the Administrative Record, and LINA's Motion for Summary Judgment on Counterclaim. The Court has reviewed the entire record, as well as the pleadings and exhibits, with respect to the instant motions. The issues have been fully briefed, and no hearing is deemed necessary. *See* Local Rule 105.6 (D. Md. 2008). For the reasons stated more fully below, the Court will grant in part and deny in part Linck's Motion for Summary Judgment, deny LINA's Motion for Judgment on the Administrative Record, and grant LINA's Motion for Summary Judgment on Counterclaim.

---

[1] The other Defendants in this case were voluntarily dismissed by Plaintiff on April 4, 2008 (Docket No. 10).

1

I.     **FACTUAL AND PROCEDURAL BACKGROUND**

From 2000 through April 2003, Linck worked as a Senior Sales Representative for Arrow Electronics, Inc. ("Arrow").[2]  Arrow provided its employees with a long-term disability ("LTD") plan, which is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*.  LINA is the claim administrator for Arrow's LTD plan.  As administrator of the LTD plan, LINA is a fiduciary and must administer benefits claims in conformance with the documents and instruments governing the LTD plan.

On November 16, 2001, Linck injured himself by lifting computer parts and boxes while working for Arrow.  As a result of his injuries, Linck ceased working on April 4, 2002, due to cervical disc disease, facet arthropathy, and migraine headaches.

On July 18, 2002, LINA approved Linck's claim for LTD benefits, with benefits commencing on July 3, 2002 in the gross monthly amount of $5225.00.

On July 30, 2002, Dr. Octavio Polanco performed an anterior cervical decompression surgery and fusion at level C5-6 and C6-7 on Linck.  Linck visited Dr. Polanco several times after the surgery.  His last visit was in October 2002.  Linck did not see Dr. Polanco again until the spring of 2007.

Following Dr. Polanco's surgery, Linck was treated by a number of doctors for pain and complications related to his cervical disc disease and migraine headaches.  Linck was treated by the following doctors: (1) Dr. Jodi Green from January 20, 2003 until December 24, 2003; (2) Dr. Allan Belzberg from March 31, 2004 through January 10, 2007; (3) Dr. Tebor Frekko from July 22, 2004 through November 22, 2004; (4) Dr Robert Gerwin from August 20, 2004 through March 19, 2007;

---

[2] Linck is also the founder of Washington Business Consulting, Inc., WBC Security Solutions, and The Missing Linck.  It appears that Linck is still affiliated with these entities today, though there is no evidence in the record showing that Linck earns income through any of these entities.

2

and (5) physical therapist May Kesler from April 9, 2005 through August 10, 2005.  The medical records from these visits, though largely based on Linck's subjective complaints of pain, reflect a man that suffered severe migraines, dizziness, back pain, and an impaired ability to concentrate. These problems are directly caused by Linck's cervical spine disease or the medications Linck takes to alleviate pain associated with that injury.  On November 11, 2004, Dr. Gerwin opined that Linck was permanently disabled.

In early 2005, Link was awarded Social Security Disability Insurance ("SSDI") benefits due to disability caused by his cervical disc disease and migraines.

In the spring of 2005, Linck submitted a disability questionnaire to LINA.  In that document, Linck indicated that he did not get out of bed until after noon or later; had to take sleeping pills to fall asleep; slept poorly when he did sleep; had major dizziness; had severe headaches and neck, arm, and shoulder pain; could not perform driving, lifting, or carrying functions; and had impaired cognitive skills and concentration due to his medications.

After receiving this disability questionnaire, LINA hired an investigator to conduct video surveillance of Linck on June 13, 2005 through June 16, 2005.  The video from that surveillance showed Linck leaving his house around 7:30 am on three days and 10:30 am on the fourth day; driving around the Washington D.C. metropolitan area for long periods of time; attending a conference; visiting an office building and staying inside for hours; taking items out of his car and trunk; walking with a friend to lunch; pumping gas; and visiting several stores.

Linck has submitted a letter from an organizer of the June 13, 2005 conference.  The letter states that Linck was scheduled to moderate a panel at the conference but that Linck was unable to perform this function due to his medical problems.  Linck apparently sat in the back of the conference and did not participate.

On September 12, 2005, Dr. Kenneth Burres, an independent physician consultant hired by LINA, conducted a peer review to determine whether Linck was disabled.  Dr. Burres spoke with Dr. Gerwin, Dr. Ann Raffo (the daughter and associate of Dr. Frekko), and Ms. Kesler.  Dr. Burres also reviewed all of Linck's medical records and the surveillance tape.  After reviewing this evidence, Dr. Burres concluded that the evidence in the record and Linck's subjective reports of pain were inconsistent with the activity on the surveillance video.  Thus, Dr. Burres opined that Linck could perform  full-time sedentary or light work.

LINA shared the surveillance video and Dr. Burres' report with Dr. Gerwin, Dr. Raffo, and Ms. Kesler.  Dr. Raffo agreed with Dr. Burres that Linck could return to work.  Dr. Gerwin also agreed with Dr. Burres but indicated that he wanted to speak with Linck.  Ms. Kesler did not comment.

On October 20, 2005, LINA mailed a benefits denial letter to Linck, indicating that his LTD benefits would be terminated on November 2, 2005.  In reaching this decision, LINA concluded that Linck's disability was no longer supported by the record.

Linck again visited Dr. Gerwin on December 12, 2005.  The medical report from that visit states the following:

> There is a question about his ability to work.  He says that his pain is too great to allow him to work.  The surveillance camera shows him moving in apparent comfort, but cannot determine the degree of discomfort that he actually has.  His physical examination does not reveal disabling impairments.  I noted that after viewing the surveillance video, I thought that Mr. Linck could work, but that I had not had an opportunity to discuss this with Mr. Linck.  There is a conflict here that cannot be resolved by either today's history and examination, nor by the surveillance video. . . . In the final analysis, every evaluation has limitations, and we come down to the individual['s] own perception that his pain is too great to permit regular or protracted work-activity.  My examination cannot be the deciding factor.

(LINCK CLAIM FILE ("LCF") at 000616.)

4

Linck appealed LINA's decision.  In June 2006, LINA denied Linck's first appeal of the termination decision.  Linck then filed a second appeal.  During the process of the second appeal, Linck submitted additional evidence from 2007 that showed that Linck's cervical disc disease had become worse.  For example, on May 2, 2007, Dr. Gerwin opined that Linck was "totally and permanently disabled."  In addition, magnetic resonance imaging ("MRI") scans of Linck's cervical spine were performed on August 2004, October 2006, and April 2007.  The 2004 and 2006 MRI were relatively normal, but the 2007 MRI clearly showed that Linck had degenerative spurs on his cervical spine.  As a result of the 2007 MRI, Linck visited Dr. Polanco on April 19, 2007.  Dr. Polanco also concluded that Linck was permanently disabled.

During the course of the second appeal, LINA hired a second independent physician consultant, Dr. Thomas Mehalic, to review Linck's case.  Dr. Mehalic reviewed the evidence in the record and spoke with Dr. Polanco's secretary.  After conducting this review, Dr. Mehalic concluded that there was no evidence in the record to support a finding of disability when LINA terminated Linck's benefits in the fall of 2005.  However, Dr. Mehalic agreed that Linck was disabled as of May 2, 2007.

On July 10, 2007, LINA denied Linck's second appeal.  LINA found that there was no evidence to support a finding of disability on November 2, 2005.  Linck then filed this case on November 15, 2007.

## II.   STANDARD OF REVIEW

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  The court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to

particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  When parties file cross motions for summary judgment, the court must view each motion in a light most favorable to the non-movant. *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).  To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  While the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences.  *See Deans v. CSX Transp., Inc.,* 152 F.3d 326, 330-31 (4th Cir. 1998).  Additionally, hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment.  *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

## III.    ANALYSIS

There are no genuine disputes of material fact in this case, and, thus, the Court must determine which party is entitled to summary judgment on both Linck's claim and LINA's counterclaim.  Each claim is addressed below.

### A.    <u>Denial of Benefits</u>

Pursuant to the Employee Retirement Income Security Act ("ERISA"), an employee can bring a civil action to recover benefits due under an employee welfare benefit plans.  29 U.S.C. § 1132 (a)(1)(B) & (e).  The denial of benefits under an ERISA plan must "be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115.  "If the administrator or fiduciary is given discretionary power under

the plan, his decisions are reviewed for abuse of discretion and will not be disturbed if they are reasonable." *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 787 (4th Cir. 1995).

Based on the Fourth Circuit's holding in *Woods v. Prudential Ins. Co.*, 528 F.3d 320 (4th Cir. 2008), the parties concede that the Court should conduct a *de novo* review of LINA's decision. Nonetheless, the parties rely on numerous cases and principles addressing how a district court should review a claim administrator's decision under an abuse of discretion standard. Those cases are largely irrelevant to this Court's determination. This Court must simply review the record before it and determine whether Linck was entitled to benefits under the LTD plan. In conducting this review, the Court must address two questions. First, was Linck disabled. Second, if Linck was disabled, what amount of monthly benefits should LINA have provided to him.

### 1.    Was Linck Disabled?

Under the LTD plan Linck was disabled in October 2005 if he was "unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings." (LCF at 000005.) Under the LTD plan, Linck had was required to produce evidence showing that he was disabled. (LCF at 000012 ("The Insurance Company will require continued proof of the Employee's Disability for benefits to continue.").)

Linck argues that it is undisputed that he suffers from degenerative disc disease and migraines and that these conditions cause him pain. Linck asserts that the medications he takes and the pain he suffers has rendered him disabled from the time of his injury to the present. Linck relies on the voluminous amount of medical reports in the record showing that he suffers from these conditions and that his doctors frequently have opined that Linck can not return to work.

LINA argues that the video surveillance of Linck in the summer of 2005 and Dr. Burres' report shows that Linck was not disabled at that time.  LINA asserts that the only medical evidence in the record is based on Linck's subjective reports of pain and not on any objective evidence.  LINA further argues that several of Linck's doctors agreed with Dr. Burres' conclusion that Linck was not disabled and was able to work in the fall of 2005.   In asserting these argument, LINA concedes that Linck was disabled as of May 2, 2007.  However, LINA argues that this later determination of disability is irrelevant.

Linck counters that the video surveillance occurred on "good days" when his pain was not quite as disabling.  Linck states he took large doses of pain medication on the surveillance days and that he was exhausted for days afterwards.  Linck also claims that he was not able to participate in the conference he was seen attending on the video.

The Court has reviewed the administrative record, watched the surveillance video, reviewed the cases cited by the parties, and considered the parties' arguments.  Having done so, the Court believes that Linck presented sufficient evidence to show that he was continuously disabled from the date his LTD benefits began to the present.  In reaching this decision, the Court relies on several factors.

First, the Court notes that there is an abundant amount of evidence in the record showing that Linck suffered from serious migraines and back problems as a result of his cervical spine problems.  Second, Linck presented a diary showing his typical daily activity level.  Linck's journal shows that he is frequently in pain and capable of little to no activity.  Third, Linck was continuously on heavy doses of medications, including narcotics, that are known to cause dizziness and concentration problems.  Fourth, the Social Security Administration previously determined that Linck was disabled.  While this determination was made prior to the video surveillance, the Court nonetheless

believes that decision is relevant.  Fifth, the record shows that Linck suffered a cervical spine injury as a result of work related activities in 2001 and that these injuries continued to affect Linck up until at least the filing of the present motions.

Finally, the Court must address the surveillance video.  Although the surveillance video raises some questions, the Court notes that it is not able to determine whether Linck suffered any pain or dizziness while performing the activities on the video.  Moreover, the Court does not know what activities Linck was capable of performing after he entered the buildings he is seen entering on the video. The video merely shows that Linck was capable of driving, at least for a few days, in the local D.C. metropolitan area; that he could walk short distances; that he could pick up a suit coat and some papers; and that he could pump gas.  The Court does not believe the activities reflected on the surveillance video definitively prove that Linck was capable of working full-time.  Moreover, the Court notes that the opinions of Linck's doctors after reviewing the surveillance video are not that persuasive.  Dr. Raffo was not Linck's physician; her father Dr. Frekko was.  It was Dr. Raffo that opined on whether Linck could work after reviewing the video.  Her father offered no such opinion.  Dr. Gerwin also reviewed the surveillance video, but his opinion was qualified.  Dr. Gerwin clearly stated that he wanted to speak with Linck after viewing the video.  Dr. Gerwin's reservations are reflected in his December 2005 medical report, which is quoted above.  In that report, Dr. Gerwin opined that the video did not definitively answer the question of whether Linck could work.  Dr. Gerwin noted that a patient's subjective reports of pain often are determinative of whether the patient can return to work.

Considering these factors, the Court believes that the vast amount of evidence documenting Linck's pain and complications supports a finding of disability.  As such, the Court finds that LINA erroneously terminated Linck's benefits on November 2, 2005.  In reaching this decision, the Court

does not believe the record supports a finding that LINA acted in bad faith.  The Court also notes that Linck seeks relief pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), and, as such, he is entitled to recover only benefits due him and not punitive or compensatory damages.  The Court also does not believe it appropriate to declare that LINA must provide benefits to Linck until age 65, because the Court is not in the position to declare that Linck will never recover from his injuries.

   2. <u>Amount of Benefits</u>

  Linck argues that his monthly benefits should have been based of his Indexed Covered Earnings, as defined in the LTD plan, which would result in his monthly benefits increasing over time.  LINA argues that Linck's benefits do not increase and are based on Linck's Covered Earnings, as defined by the LTD plan.  Linck responds that Indexed Covered Earnings and Covered Earnings are the same thing under the LTD plan.  The Court agrees with LINA and finds that Linck's arguments are meritless.

  There are two relevant documents at issue here: the LTD plan (i.e., the actual insurance policy) and the Summary of Plan Description ("SPD").  The SPD is a more simplified explanation of the LTD plan.  The SPD clearly states: "Should there be any discrepancies between the provisions outlined in the Summary Plan Description and the Long Term Disability insurance contract produced by CIGNA, the provisions of the insurance contract shall prevail." (LCF at 000028.)  With this in mind, the Court turns to the parties' arguments.

  First, the Court notes that the LTD policy clearly states that "[a]ny increase in an Employee's Covered Earnings will not be effective during a period of continuous Disability." (LCF at 000005.)  This statement alone shows that Linck's argument is erroneous.  Second, under both the LTD plan and the SPD, the terms Indexed Covered Earnings and Covered Earnings have separate definitions.

Linck recognizes this fact in his motion but nonetheless argues that the terms are identical.  This position is baffling.  Third, the definition of Covered Earnings shows that the amount does not increase.  The LTD plan states: "Covered Earnings means an Employee's earnings as figured from the W-2 form . . . received from the Employer for the calendar year just prior to the date Disability begins."  (LCF at 000005.)  Fourth, the LTD plan clearly states that Disability benefits are based on Covered Earnings.  (LCF at 000005 ("The lesser or 60% of an Employee's monthly Covered Earnings rounded to the nearest dollar or the Maximum Disability Benefit [$15,000 per month], reduced by any Other Income Benefits.").)

Linck essentially bases his argument on one text box that appears in the SPD, which states that "Disability benefits are calculated using your Indexed Covered Earnings."  This argument is unpersuasive for three reasons.  First, the SPD also states that disability benefits are calculated using Covered Earnings.  Second, the SPD's example calculation uses Covered Earnings.  Third, the LTD plan itself clearly states that benefits are calculated using Covered Earnings.  To the extent that the SPD differs from the LTD plan, the LTD plan trumps.

Accordingly, the Court finds that the prior gross monthly benefit award of $5225.00 is proper and that this amount does not increase over time under the LTD plan.

### B.   <u>Counterclaim</u>

Under the LTD plan, Disability benefits are reduced by Other Income Benefits received by Linck.  SSDI benefits are Other Income Benefits under the LTD plan.  (LCF at 000014.)  Linck signed a Reimbursement Agreement so that LINA would not deducted estimated SSDI benefits from his Disability benefits while the claim for SSDI benefits was pending.  (LCF at 000015, 001336.)  The LTD plan clearly states: "If benefits are overpaid, the Insurance Company has the right to recover the amount overpaid by either of the following methods.  1. A request for lump sum

payment of the overpaid amount.  2. A reduction of any amount payable under the Policy."  (LCF at 000016.)  After Linck was granted SSDI benefits, and while Linck was still receiving Disability benefits from LINA, LINA deducted the SSDI benefits from the monthly benefits amounts due Linck.  After benefits were terminated, Linck still had an overpayment balance of $57,527.60.

In its counterclaim, LINA argues that Linck is required to reimburse LINA for the overpayment balance of long-term disability benefits in the amount of $57,527.60 due to Linck's award of SSDI benefits.  Linck does not contest the amount of overpayment balance, the fact that he signed a Reimbursement Agreement, or the fact that the language of the LTD plan allows recovery of the SSDI overpayment.  Rather, Linck argues that it is against public policy to force him to reimburse LINA for SSDI benefits he received.  The Court agrees with LINA and finds Linck's arguments meritless.

Linck has cited no case law to support his argument that deducting SSDI benefits from his Disability benefits awards is a violation of public policy.  To the contrary, courts have routinely upheld similar reimbursement provisions.  *See Lake v. Metro. Life Ins. Co.*, 73 F.3d 1372, 1377-79 (6th Cir. 1996); *Keil v. Life Ins. Co. Of N. Am.*, No. 07-11816, 2008 WL 2478327, at *7 (E.D. Mich. June 17, 2008) *Onofrieti v. Metro. Life Ins. Co.*, 320 F. Supp. 2d 1250, 1256 (M.D. Fla. 2004); *Greig v. Metro. Life Ins. Co.*, 980 F. Supp. 169, 174 (W.D. W. Va 1997).  The language of the LTD plan and Linck's reimbursement agreement are clear.  The Court does not believe that requiring Linck to adhere to his contractual obligations violates public policy.  LINA is entitled to reimbursement in the amount of $57,527.60.

**C.      Attorneys Fees**

Both parties have requested attorney fees in their motions.  The Court is not prepared to rule on these requests at this time.  Rather, the Court believes that, to the extent the parties still seek

attorneys fees, the parties should file, within 14 days of the entry of the accompanying Order, separate motions for attorneys fees explaining why attorneys fees are warranted and documenting the requested fees.

## IV.   CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Linck's Motion for Summary Judgment, deny LINA's Motion for Judgment on the Administrative Record, and grant LINA's Motion for Summary Judgment on Counterclaim. Linck will be awarded Disability benefits in the gross monthly amount of $5,225 from November 3, 2005 through the date of judgment.  The award to Linck will be offset by the $57,527.60 overpayment that Linck owes to LINA and by any additional SSDI benefits that Linck received from November 3, 2005 through the date of this judgment.  A separate Order will follow.


    August 3, 2009                             /s/           
           Date                            Alexander Williams, Jr.
                                    United States District Judge